# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| DIANA MATA-CUELLAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:10-00619 |
| | ) Judge Sharp |
| TENNESSEE DEPARTMENT OF | ) |
| SAFETY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

Pending before the Court is Defendants' Motion for Summary Judgment (Docket No. 74), to which Plaintiff has responded in opposition (Docket No. 81), and Defendants have replied (Docket No. 83). For the reasons set forth below, Defendants' Motion will be granted.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

On October 21, 2010, Plaintiff filed a Second Amended Complaint (Docket No. 50) in which she sought to represent a class of all foreign-born persons who, when applying for a Tennessee driver's license, had their Naturalization Certificates or other identification seized by state employees. That six-count Complaint contained allegations that Defendants violated (1) the search and seizure provisions of the Fourth Amendment and the due process clause of the Fourteenth Amendment to the United States Constitution; (2) the privileges and immunity clause of Article IV Section 2 of the United States Constitution; (3) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; (4) the federal program discrimination provision of 42 U.S.C. § 2000d; and (5) the equal protection and unreasonable searches and seizures provisions of the Tennessee Constitution. Plaintiff also asserted a "constitutional" claim for failure to train.

1

Named as Defendants were the Tennessee Department of Safety and six state employees.

On September 10, 2010, prior to the filing of the Second Amended Complaint, Judge Trauger entered an Order denying Plaintiff's Motion for Class Certification (Docket No. 31).[1] Subsequently, on March 4, 2011, Judge Trauger entered an Order (Docket No. 68) granting Defendants' unopposed Motion for Partial Summary Judgment as to Count IV (Docket No. 61), and dismissing Plaintiff's discrimination claim under 42 U.S.C. § 2000d. Judge Trauger also granted Defendants' unopposed motion (Docket No. 59) seeking dismissal of the claims against the Tennessee Department of Public Safety.

Against this backdrop, Defendants filed their Motion for Summary Judgment in which they seek dismissal of all remaining claims against all remaining Defendants. In response, Plaintiff concedes that "Defendants are entitled to Summary Judgment as to Counts II, III, V and VII"[2] (Docket No. 81 at 1), but maintains that summary judgment is inappropriate as to her claims against Defendants Marsha McNiel ("Ms. McNiel") and Ronnie McDaniel ("Mr. McDaniel") as set forth in Count I of the Second Amended Complaint. Thus, what began as a multi-count, multi-defendant putative class action has been whittled down to a single count against two Defendants. Accordingly, the Court sets forth the relevant facts only as they relate to Count I.

Plaintiff and her husband went to the Hamblin County license branch in Morristown, Tennessee on March 25, 2010, so that Plaintiff could apply for a Tennessee driver's license. Ms. McNiel, an administrative assistant at the branch who normally prepares reports, was helping out at the front counter that day and called Plaintiff to the counter.

---

[1] Plaintiff has filed no further motion requesting class certification as required by L.R. 23.01(b).

[2] There is no "Count VI" in the Second Amended Complaint.

2

When Plaintiff went to the counter, she presented copies of her Certificate of Citizenship issued by the United States Citizenship and Immigration Service ("Certificate"), her Social Security Card, an Alabama identification card, and two pieces of mail which contained her address as identification. Plaintiff claims that shortly after presenting the documents, Ms. McNiel told her that the Certificate appeared to be fake, and that it had eight instead of nine numbers. Ms. McNeil asked Plaintiff for the original Certificate which Plaintiff carried with her in a plastic sleeve.[3] Ms. McNiel then said she was going to call "immigration" to verify the numbers.

Instead, Ms. McNiel left the counter with the original Certificate and took it to Mr. McDaniel, the Branch Supervisor. Ms. McNiel and Mr. McDaniel began whispering and then Mr. McDaniel took the Certificate out of the plastic pouch and began "scratching" or "rubbing" the numbers up in the upper right corner of the Certificate "with his right thumb, like trying to see if they were retyped or something[.]" (Pf. Depo. at 49).[4] Mr. McDaniel then came to the counter and told Plaintiff he was going to confiscate the Certificate because it was fake.

Plaintiff claims she told Ms. McNiel and Mr. McDaniel that the Certificate was real, had not been altered, and that she had paperwork at home to prove it was real. Plaintiff claims she was told that they would wait for her to obtain supporting documentation, but, instead, Mr. McDaniel confiscated her documents. In doing so, she was presented with several forms, including a "Tennessee Highway Patrol Property/Receipt Release" which listed her Certificate, and the copies of her Social Security and Arkansas identification cards. She insists, however, that she was never

---

[3] Plaintiff claims the plastic sleeve contained no smudges or smears from the Certificate being housed inside.

[4] Plaintiff concedes that Mr. McDaniel used only his thumb, and did not tear or wrinkle the Certificate in any way while inspecting the document.

presented with, and never signed, a "Notice of Document Seizure" form.[5]

Plaintiff left the license branch. She returned sometime later, but claims she was told "that it was too late, that they had already sent it to the department of fraud[.]" (Id. 53).

The foregoing represents Plaintiff's version of the facts as they relate to the confiscation of the Certificate, and the Court credits that version insofar as it goes in ruling on the pending Motion for Summary Judgment. However, the Court summarizes Ms. McNiel's and Mr. McDaniel's testimony, as well as bureau policy, to add context to the dispute and to complete the story.

Ms. McNiel claims that, when presented with the copy of the Certificate, she was unable to make out all of the numbers and asked Plaintiff for the original so that she could take it to the copier and try to darken the document. At the time Ms. McNiel was handed the Certificate, it was in a plastic sleeve and Plaintiff gave Ms. McNiel permission to remove the Certificate from the sleeve. According to Ms. McNiel, when she removed the document, some of the numbers and letters appeared to be smudged. Ms. McNiel made a copy but, allegedly, still could not make out the numbers.[6] Ms. McNiel then approached her supervisor, Mr. McDaniel, and asked him to read the document because she was having trouble making out the numbers. She also claims she told him that the document appeared to have been altered because there were smudges in the blank spaces around the typed areas, and the plastic sleeve appeared to have indentations on it and ink smudges inside.

Mr. McDaniel claims that when Ms. McNiel presented him with the documents, she said that

---

[5] A copy of that form has been submitted in the summary judgment record. However, that form does not contain Plaintiff's signature.

[6] At this point, the Court notes that Ms. McNeil did in fact copy the numbers onto Plaintiff's Application for Tennessee Driver's License.

she was having trouble reading some of the numbers. Upon looking at the document, Mr. McDaniel claims that he saw "some visible alterations or wear in certain areas that were just specifically [Plaintiff's] information, not the document as a whole." (McDaniel Depo. at 11). Focusing on the numbers, Mr. McDaniel saw that "they were not plain as print type. There was a little smudging, some roughing of the paper around them." (Id. at 16). Mr. McDaniel then compared the Certificate to specimens in his "Blue Book," and determined that, while the Certificate "looked like an actual issued document," the areas around Plaintiff's name and date of birth appeared to be altered. He rubbed around those areas and ink came off on his thumb. (Id. at 17-18). There was also some "ghosting of other letters[.]" (Id. at 19). Ultimately, Mr. McDaniel determined that the document was not acceptable because "[i]t plainly appeared to be altered." (Id.). Mr. McDaniel then approached Plaintiff and told her the documents would be confiscated. He also presented her with some paperwork, which she signed.

After confiscating the documents, Mr. McDaniel prepared a "Tennessee Department of Safety Fraudulent License Report" in which he wrote:

> Applicant presented a Certificate of Citizenship with many of the areas of pertinent information appearing to have been erased and retyped. The numbers that were retyped were not as many as those suggested by the samples that we had received. Applicant does have correct status for S.A.V.E.[7] and document is correct Format. However, the plastic sleeve contain[ing] it show[s] evidence of a typewriter impression of altered info.

(Docket No. 81-6 at 1). Mr. McDaniel also sent a letter to Tiffany Taylor ("Ms. Taylor"), the Deputy Director of Driver Services for the State of Tennessee, explaining why Plaintiff's Certificate had been confiscated. In the letter, Mr. McDaniel also acknowledged that the general policy was

---

[7] "S.A.V.E" is an acronym for Systematic Alien Verification for Entitlement, a program used to determine an individual's immigration status.

to call the local police in such situations, but explained that the Morristown police preferred that the Tennessee Highway Patrol handle such matters. Mr. McDaniel also explained that there were few highway patrol officers in the area, and they were usually unable to respond before an applicant left the license branch. (Id. at 21). Mr. McDaniel forwarded the documents to the Criminal Investigative Division of the Department of Public Safety where they remained for some thirty days before being returned to Plaintiff.

License branch employees receive extensive training relating to documents presented for identification, and supervisors receive even more training in the area. This includes training on many different documents, including permanent resident alien cards, licenses from other states, Social Security cards, birth certificates from other states and countries, passports, Certificates of Citizenship, and Naturalization Certificates, among others. In addition, all employees are given guidebooks to keep at their desks as reference in the event there is a question about a document or its security features.

In reviewing documents, examiners are instructed to view a copy of the document first, and, if any irregularities are apparent, to request the original for review. In reviewing the original, examiners are taught to visually inspect and touch it. If an examiner has any doubts about the authenticity of a document, he or she is to consult with a supervisor who can do a more thorough inspection with the aide of a magnifying glass or UV light. Supervisors are also taught to feel the portion of any documents that have typing on them. They can run computer programs to check on the validity of such things as a Social Security number.

If there is probable cause to believe a document has been altered or is otherwise fraudulent, employees are instructed to seize the document and provide the applicant with a Notice of Seizure

form that informs the applicant of the right to request a hearing, and a Property Receipt that indicates which documents have been seized. When a document is seized, the preferred practice is to call the police, but if officers are not available, employees are instructed to overnight the documents to the Criminal Investigative Division of the Department of Safety.

## II. APPLICATION OF LAW

The standards governing motions for summary judgment are well-known and need not be repeated in detail. A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

At this point, the only remaining issues are whether Plaintiff can establish a Fourth and/or Fourteenth Amendment claim under 42 U.S.C. § 1983 against Ms. McNiel and/or Mr. McDaniel as alleged in Count I of the Second Amended Complaint. Omitting the introductory paragraphs and focusing solely on the substantive allegations, Count I alleges the following:

> 65. By requiring affirmative action to protect the immigration document and by not assuring a hearing in the event of a seizure of an immigration document, defendants General Order 544 denied Plaintiff procedural due process, as guaranteed by the Fourth and Fourteenth Amendments.
>
> 66. The detention of Plaintiff's naturalization certificates for more than one month by the Tennessee Department of Safety exceeds any reasonable time frame and violates Plaintiff's Fourth Amendment right to freedom from illegal seizure and due process.

7

> 67. The Tennessee Department of Safety has overreached its power over naturalized citizens by confiscating valid naturalization certificates without adequately training its agents and representatives in the reasonable suspicion level or probable cause level required for such seizures and shifting the burden to applicants for driver licenses to take affirmative actions to recover their confiscated driver licenses.
>
> 68. In depriving Plaintiff of these rights, Defendants acted under color of state law. The deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

(Docket No. 50, Amended Complaint ¶¶ 65-68).

As a preliminary matter, while Plaintiff seeks to hold Ms. McNiel and Mr. McDaniel liable, Count I appears to be specifically directed at the Tennessee Department of Safety, an entity which has been dismissed from this case. Plaintiff alleges that the Tennessee Department of Safety kept her Certificate for more than one month, had a policy of confiscating Naturalization Certificates, and failed to train its agents regarding probable cause to confiscate such certificates. Further, General Order 544 is a document issued by the Tennessee Department of Safety, intended to establish policies and procedures relating to the detection and confiscation of fraudulent documents. Nevertheless, even if Count I is broadly read to encompass specific claims against the remaining two individual Defendants, summary judgment in their favor is warranted under the evidentiary record in this case.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law." Harbin-Bey v. Rutter, 420 F.3d 571, 574 (6th Cir. 2005). Here, the parties agree that Ms. McNiel and Mr. McDaniel were acting under color of state law when Plaintiff's Certificate was confiscated and so the question becomes whether either of those Defendants deprived Plaintiff of a right under the Fourth or Fourteenth

Amendments to the United States Constitution in confiscating the Certificate.

Plaintiff's Fourth and Fourteenth Amendment claims against Ms. McNiel fail at the outset because Ms. McNiel was not the one who confiscated Plaintiff's Certificate. Even under Plaintiff's version of the facts, the most that Ms. McNiel did was to review the Certificate, claim it had too many numbers and was fake, and take it to Mr. McDaniel for further investigation. Her actions did not rise to the level of a constitutional deprivation. See, United States v. Place, 462 U.S. 696, 703 (1983) (brief seizure of property for limited investigation permissible under Fourth Amendment); United States v. Robinson, 390 F.3d 853, 870 (6th Cir. 2004) (brief investigative detention of the subject package, based upon reasonable suspicion that it contained contraband, did not run afoul of the Fourth Amendment prohibition against unreasonable seizures).

Moreover, the decision to confiscate the Certificate was Mr. McDaniel's, and Plaintiff offers no evidence to the contrary. A section 1983 claim requires personal culpability. See, Murphy v. Grenier, 406 Fed. Appx. 972, 974 (6th Cir. 2011) ("Personal involvement is necessary to establish section 1983 liability"); Gregory v. City of Louisville, 444 F.3d 725, 751 (6th Cir. 2006) (for liability to attach, defendant "must have actually engaged in unconstitutional behavior"). Plaintiff has not shown that Ms. McNiel was responsible for a constitutional deprivation.

Turning to Plaintiff's claims against Mr. McDaniel, the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The text of the Fourth Amendment therefore extends protection against unreasonable seizures of personal property, i.e., 'papers[ ] and effects,' as well as seizures of the person." Farm Labor Organizing Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 543 (6th Cir. 2002).

Ordinarily, the seizure of personal property by the government is unreasonable under the Fourth Amendment unless it is taken pursuant to a warrant which is issued upon a showing of probable cause. Place, 462 U.S. at 701. However, personal property may be seized upon a showing that probable cause exists to believe that the property is (or contains) contraband. See, Florida v. White, 526 U.S. 559, 566 (1999).

"The probable cause standard is a 'practical, non-technical conception' that deals with the 'factual and practical considerations of everyday life.'" United States v. Frazier, 423 F.3d 526, 531 (6th Cir.2005) (quoting, Illinois v. Gates, 462 U.S. 213, 231 (1983)). It is based upon a on a "totality of the circumstances," and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Gates, 462 U.S. at 244 n.13. The totality of the circumstances standard permits officials "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.' United States v. Martin, 289 F.3d 392, 398 (6th Cir.2002). Courts are to take a practical, common-sense look into whether "the facts and circumstances known to the official warrant a prudent man in believing an offense has been committed." Brooks v. Rothe, 577 F.3d 701, 706 (6th Cir. 2009).

In this case, when Mr. McDaniel was presented with the Certificate, he was told by Ms. McNiel that she could not make out the numbers, and Plaintiff cannot dispute that because she could not overhear their conversation. Nor can Plaintiff dispute that, from Mr. McDaniel's perspective, there was some smudging and roughness around the numbers, that there was "ghosting" around some numbers, and that he believed the Certificate was altered. Moreover, Plaintiff concedes that license branch employees receive extensive training in fraudulent document detection, and that, as

a part of the training "[s]upervisors are . . . taught to feel the portions of any documents that have been typed in." (Docket No. 81-1, SOF ¶ 62 & response thereto). Plaintiff also concedes that when "Mr. McDaniel rubbed his thumb over the certificate . . . ink from the areas of personal information came off on his thumb." (Id. ¶ 96 & response thereto). This evidence is sufficient to establish probable cause to believe the Certificate may have been altered.

In concluding that probable cause existed for the seizure of Plaintiff's Certificate, the Court has considered Plaintiff's arguments to the contrary. She claims that, notwithstanding Mr. McDaniel's deposition testimony, there were no indentations on the plastic sleeve and ink from the Certificate did not come off onto the plastic sleeve – a position supported by Special Agent Larry Pollard ("Agent Pollard") of the Criminal Investigation Division of the Tennessee Department of Safety who examined the Certificate and sleeve and saw no indentations or transfers of ink. Leaving aside that Mr. Pollard also indicated that the Certificate "appear[ed] to be altered by someone in that the ink rubbed off very easily," (Pollard Decl. ¶6), the fact that no ink or indentations may have been on the sleeve does not undercut Plaintiff's concession that ink came off on Mr. McDaniel's thumb when he rubbed the document. Further, Plaintiff's contention that Ms. Taylor is not in a position to opine whether ink should come off official immigration documents says nothing about Mr. McDaniel's training, and he claims he learned that "ink should smear or come off when rubbed or scratched." (McDaniel Decl. ¶ 3).

Regardless, Mr. McDaniel is entitled to qualified immunity on Plaintiff's Fourth Amendment claim. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457

U.S. 800, 818 (1982). Qualified immunity attaches if an official reasonably believes that his actions were lawful in light of clearly established law, and this remains so although the belief is subsequently shown to be erroneous. Harris v. Bornhorst, 513 F.3d 503, 511 (6th Cir. 2008). "Thus, even if a factual dispute exists about the objective reasonableness of the [official's] actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an [official] reasonably could have believed that the [action] was lawful." Kennedy v. City of Villa Hills, 635 F.3d 210, 214 (6th Cir. 2011).

"Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." O'Malley v. City of Flint, ___ F.3d ___, ___, 2011 WL 3055227 at *2 (6th Cir. July 26, 2011). "Plaintiff must show both that, viewing the evidence in the light most favorable to her, a constitutional right was violated and that the right was clearly established at the time of the violation." Chappell v. City of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009). This is generally done by pointing to "'binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point.'" Kennedy, 635 F.3d at 214-15 (citation omitted). "If plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, she will have failed to carry her burden." Chappell, 585 F.3d at 907.

In her reply brief, Plaintiff cites no authority, let alone any precedent which would suggest that Mr. McDaniel's actions, under the facts of this case, deprived her of a constitutional right. Plaintiff has failed to carry her burden.

In any event, "'[f]or a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holzemer v. City of Memphis, 621 F.3d 512, 517 (6th Cir. 2010) (quoting, Leonard v.

Robinson, 477 F.3d 347, 355 (6th Cir.2007)). "However, '[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.'" Id. (quoting, Wilson v. Layne, 526 U.S. 603, 615 (1999)).

Here, the Court cannot say that a reasonable license branch supervisor presented with a document which he believes to be altered and which indisputably has ink which comes off when rubbed would understand that confiscating the document violates a constitutional right. This is all the more so since "qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful," and "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Chappell, 585 F.3d at 907 (quoting, Hunter v. Bryant, 502 U.S. 224, 229 (1991)). Mr. McDaniel has not been shown to be plainly incompetent or to have knowingly violated the law, and he is entitled to qualified immunity on Plaintiff's Fourth Amendment claim.

Finally, Mr. McDaniel is entitled to summary judgment on Plaintiff's Fourteenth Amendment due process claim. The Fourteenth Amendment provides that a State may not "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend XIV cl. 2. "The Supreme Court has held that the hallmark of due process is that a deprivation of a property interest must be "preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).

In her response brief, Plaintiff claims that, because she was not provided with the Notice of Seizure form which explained the statutory basis for the seizure and contained a telephone number she could call if she had any questions, she was not accorded notice and an opportunity for hearing

13

as required by the due process clause. Even accepting as a fact that Plaintiff did not receive the form, however, Plaintiff was not deprived of procedural due process within the meaning of the Fourteenth Amendment.

Plaintiff indisputably had notice that her Certificate was being confiscated because Mr. McDaniel told her so and she signed the "Property/Receipt Release" which listed the Certificate. As for a hearing, the Supreme Court has explained that while notice is required to inform a citizen that he will be deprived of a property interest, "[n]o similar rationale justifies requiring individualized notice of state-law remedies which . . . are established by published, generally available state statutes and case law." City of West Covina v. Perkins, 525 U.S. 234, 241 (1999). After all, "[o]nce the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him" and the state "need not take other steps to inform him of his options." Id.

Had Plaintiff been provided with the "Notice of Document Seizure," she would have been informed that she could challenge the seizure of the Certificate through Tenn. Code Ann. § 4-5-101 *et seq.* This is a reference to the Uniform Administrative Procedures Act which is a "generally available state statute" in existence since 1974. Alternatively, Plaintiff could have sought return of her Certificate through Tenn. Code Ann. § 9-8-307(a)(1)(f). That statute provides a remedy for the "[n]egligent care, custody, or control of personal property," and has been found to be an adequate remedy for purposes of the due process clause when a plaintiff "allege[s] illegal seizure of his personal property." York v. Mills, 2000 WL 302780 at *2 (6th Cir. Mar. 17, 2000). See also, Dean v. Campbell, 1997 WL 401960 at *1 (Tenn. Ct. App. July 17, 1997) (for purposes of the due process clause, "the State of Tennessee has provided adequate procedures to assure the return of items either

negligently or intentionally converted" through Tenn. Code Ann. § 9-8-307(a)(1)(F)). Accordingly, Plaintiff's due process claim against Mr. McDaniel fails.

## III. CONCLUSION

On the basis of the foregoing, Defendants' Motion for Summary Judgment (Docket No. 74) will be granted, and this action will be dismissed.

"

*Kevin H. Sharp*
_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE